Please call the final case of the day. Final case, 4-12-0-3-204-NBC, Landreth Lumber Co. v. Workers' Compensation Commission. Counsel, you may proceed. Good afternoon. May it please the Court, Counsel. My name is Patrick Jeanette, and I'm the attorney for the employer of this matter, Landreth Lumber Co. This case is obviously a manifest weighted evidence case, very fact-specific and fact-driven. And most importantly, the facts that are contradicted within the medical records that essentially impeach the petitioner's own testimony and trial. And that's an important part of this case. The petitioner in this case had an underlying lumbar back condition that we accepted, we approved, we paid for. In fact, we still continue to pay for. But then, lo and behold, over two years later... That is the exact same case, and this one was reported timely, and there was a form 45 accident report that is probably in evidence before you. A little deja vu here. It is the exact same thing, yes, the exact same company. So he's contesting everybody else's claims. Yes. I will refrain from commenting on that. I don't know if this one is actually contested so much as we agreed to most everything, except for the cervical condition. And that's because the petitioner was being treated and for over two years made no complaints of cervical pain while he was seeing spine surgeons, while he was seeing pain doctors. And then suddenly on November 5, 2009, he goes to his pain doctor, Dr. Tom, and this is over two years after the accident, and says, I have cervical pain that's related to my accident. And completely ignored by the commission, completely ignored by the arbitrator, Dr. Tom says, recurrent pain, and that's the most important thing, recurrent pain, meaning that the pain was gone for a long period of time. Recurrent pain is hard to attribute to the accident. I do not know how such testimony or transcript in the record that is the petitioner's statement to his treating physician cannot be cited by the commission. I want to get some clarification here at the outset, because there's reference to neck pain and then there's reference to condition in cervical spine. And an issue in the cervical spine can manifest itself without neck pain but in radicular pain. Would you agree? I would agree with that. Okay. And is it Dr. Aton or Aton? Correct. Family doctor, yes. So that doctor on June the 12th of 2007, which was very close in time, within two weeks from the date of the accident, noted arm pain and ordered a cervical MRI, correct? Correct. Okay. And to me, the inference there is that there's some cervical component to this, because this person is having some radicular issues that's emanating from the neck. Correct. And they were worried about the arm. There's no disputing that. They were worried about the arm somehow being related to the cervical. Well, and I'm not talking about there being an injury to the arm. I'm talking about there being an injury to the neck, because the cervical MRI would be obviously a diagnostic test or a diagnostic examination of the neck. And so the arm pain is a radicular-type pain that's emanating from some defect in the neck, or at least that's what Dr. Aton's suspicion appears. So that would put it very close in time to the accident. Correct. He had a cervical MRI for suspicion of arm symptoms that could have emanated from the neck. There's no denying that. But then it goes away. There's no mention in the record of it for two years. And then all of a sudden he goes back to his doctor, his pain doctor, and says... Isn't there an explanation for that? Is it Dr. Purvines? What's the pronunciation of his name? Dr. Purvines? Yeah. He testified specifically that they, the claimant, he did discuss the issue, but they decided to ignore the neck problems until they were able to create the more serious low back injury. So that was explained, wasn't it? Dr. Purvines didn't testify that the petitioner was giving him complaints of neck pain in 2008-2009. I don't think the petitioner went to Purvines with any neck symptoms until 2010. And then he says, well, I've had this neck problem all along. And Dr. Purvines said, well, taking that as true, taking it true that the petitioner had neck pain and radicular symptoms from the date of accident until 2010, and then Dr. Purvines said, I would expect that pain to be consistent, and if not consistent, actually worsen over time. Did Purvines make his opinion based on what the claimant had testified to or told him, or does the record also establish that he reviewed a June 2007 cervical MRI and he saw a fresh appearing cervical herniation? Is that not in the record? That is in the record. So that's not relying on the claimant's testimony. But again, he said that his testimony, and if you look at it, it's clearly in the record, he says that for that to be true, for the current condition of neck complaints that he has in 2010, and arm complaints, he would expect the pain in the neck to be consistent from the date of accident until the time that he started complaining to Dr. Purvines in 2010. And that's when you go to the other medical records and you see clearly, Dr. Tom's are the best medical records. He clearly examines, he does physical examinations of the neck and extremities, and there are no symptoms in the neck or extremities for two years with Dr. Tom. And that's where Dr. Tom says that there's a recurrence of neck pain. So what he's telling his medical providers and what the medical providers show with regards to the neck pain is absolutely contradicted by the testimony. And the petitioner knew that at the time of trial because he knew what Dr. Purvines said, and quite frankly said, I had neck pain from the date of accident until I saw Purvines for the neck in 2010. But that is absolutely contradicted. That is absolutely impeached by the history contained in the medical records. And I don't know how the commission can ignore that. There is absolute evidence to contradict that there were neck symptoms in 2008 and 2009, that there were arm symptoms in 2008 and 2009. And yes, there was some limited treatment right after the accident that was limited to some physical therapy. And I think it was like eight weeks of physical therapy that he had, and then he was done. So if that's the case, the guy even goes to a pain psychologist at Washington University and has said, draw out your pain diagram. Tell me all the complaints of pain that you're having because we have to put a spinal cord stimulator in you. And he goes in great length and detail, and he even says that he has some pain right above the lumbar area, but no mention of neck pain and arm pain. I think that's very specific, and I think the only opinion that causally relates medically for the petitioner in this case is that of Dr. Purvines. And Dr. Purvines agrees. Yes, he says I looked at that cervical MRI. That cervical MRI may explain the current complaints in 2010, but for there to be a relation between 2007 and 2010, there still has to be a consistent pattern of pain across that entire spectrum. Well, what are you saying? In 2007, there's objective medical evidence of a tear, right? Of a tear, and there is an MRI scan that shows pathology of the cervical spine, yes. What does that have to do with 2010? It's there in 2007. And that's agreed to, and that is plausible. But I think that for you to say, to take the leap from 2007 to 2010 and say the current complaints of 2010 are related to 2007, there has to be a consistent... Well, didn't the claimant testify? He was a doctor? I mean, did he testify to that? He did testify to that. But what happens whenever all the medical evidence, every single piece of medical evidence contradicts that he had neck pain in 2008 and 2009? Well, it seems true of the arm pain. Right. But that's not true. June the 15th, the physical therapy evaluation says he's got numbness down his left arm. In July the 5th of 2007, he doesn't mention any neck or arm pain. But on August 14th of 2007, he talks about arm pain. October the 4th, weakness in his bilateral upper extremities. October 4th of 2007. He doesn't say anything. Tom focuses on the lumbar spine condition. He doesn't mention any problems with his cervical spine. But we get now to Pervines. Is that how you pronounce it, Pervines? Pervines, correct. Yeah, Pervines turns around and says, the MRI shows a fresh appearing disherniation, and he's talking about the 2007 MRI, at C7T1 level. Further impinging would help him develop a treatment or, pardon me, imaging better treatment plan. And he turns around and he says he attributes the claimant's failure to report symptoms relating to his neck before March 2010 to a focus on his significant lumbar pain. And they believe, Pervines, they don't believe your expert because your expert said he didn't look at the neck because he wasn't paid to do so. That was a nice thing to testify to. I think what Dr. Wilkie said was he didn't initially assess the neck. I think he wrote down the complaints that the petitioner made in late 2009 or early 2010 about the neck complaints but said, I'm not going to address it in the IME because I'm paid to assess the lumbar spine. So I think that those are kind of a little bit separate. Well, but he doesn't even look at the neck. Correct, and he didn't have any direction to. In fact, at that point in time, I don't think the carrier was even aware of it. That's the whole point. There were no complaints of neck pain for so long. And if you look at Dr. Pervines, he said specifically that if the petitioner had a herniated disc at C7T1 or T3 since the date of accident, it most likely would have progressed if untreated. And that he noted there was a decreased range of motion in the neck in 2010 and that if the petitioner had neck symptoms since the date of accident, he would expect a consistent or progressive physical examination of symptoms of the neck. But then you look at Dr. Tom's physical examinations of the neck. Dr. Tom examines the neck in 2008-2009. Dr. Tom finds no neck symptoms, no point tenderness, no decreased range of motion in the neck. All things that Dr. Pervines said he would have expected if this would have been a problem relating back to the date of accident. And that's the important thing here. We have the best note in this whole case is the first time the petitioner complains about neck and arm pain post-2007. And that's 2009 with Dr. Tom. And that's where Dr. Tom is saying that he has recurrent pain, meaning the pain had gone away and now it comes back. And Dr. Tom, his pain doctor, says, I have a hard time attributing that to the work accident. It is just a major stretch. Well, it's not a major stretch. I think that the testimony and opinions of Dr. Pervines by his own admission rely upon the petitioner having consistent complaints of pain, which are completely contraindicated by the medical records. Well, not consistent complaints of pain, but having told him he consistently had pain. I don't think he says it's based on him having consistently complained of the pain, but having told him that he consistently had the pain. And then everyone turns around, including Tom, and says that this condition all went untreated while the claimant focused on his low back pain, which he claimed was excruciating. And again, that pain in the neck, even during the excruciating low back pain, would be expected to be consistent and progressive for Dr. Pervines, which is contraindicated by the medical records. And it would be one thing if the neck was not assessed in 2008 and 2009, but the neck was clearly assessed in 2008 and 2009. In fact, there was even a box to mark for the pain psychologist at Washington University for the intake sheet, and the petitioner didn't mark down that he had pain. But then all of a sudden, it became a big issue for whatever reason in 2009, and that reason is stated in Dr. Tom's records, because it was recurrent pain. It was pain that hadn't been there for a couple of years. And I asked the commission this, and if you can find it, great. But where in the medical records is there anything to support the petitioner having neck and arm pain in 2008 and early 2009? In fact, the only things that you will find will be no neck pain, no arm pain, and specifically denying cervical problems to one of the most important people you see here. I want to understand something. This fresh discrimination that Pervines notes in the 2007 surgical MRI, what, does it magically go away? Well, if you listen to his testimony, I think that he admitted on cross that, I don't know that a fresh can be clearly identified as fresh in an MRI without having one predating the accident date. So he kind of backed off that in his testimony. I don't think that that's necessarily true. He said it. And even taking into consideration that there's a fresh tear with symptoms from that, those symptoms went away. And I think that that's pretty clear from the medical records. Do herniated discs just go away? I hear doctors say that. I mean, obviously this isn't in the record, but I hear doctors say that all the time, sure. I know people personally that have disc herniations absorb themselves, and their symptoms go away. I mean, that's a pretty frequent thing. It actually happens more times than not. Well, do they still have the herniation? Your time is up, Counsel. Thank you. Counsel, you may respond. Thank you. May it please the Court, my name is Ron Foster. I'm here today, I'm representing, I believe, Maury Rose, Counsel. And in this particular case, I think what we're dealing with is a very serious injury that my client sustained on June 1st, 2007, or June 7th, 2007, where he fell back carrying a window. Unfortunately, it landed on his backside, also towards his left side, and it herniated his disc. I agree that the herniation occurred in his neck, and it also occurred into his lower back. In this particular case, it was two injuries. One was much more serious than the other. And the way I tried to equate this is a lot has been made that some of the records aren't consistent with him complaining throughout, but I look at it as if I have a cold, but I get stabbed by an arrow. I'm probably going to go to the doctor and talk about the portion where I'm feeling the greatest pain, and probably not about my cold or flu, until that pain is remedied. And I think that's what happened here. But I also disagree with Counsel in this particular case, where he says the records are depleted of my client complaining of ridiculous symptoms or neck pain. That's not fair. They're depleted of it? That there are no records in 07 or 08 showing that there are ridiculous problems. I should have said void. I'm sorry, Your Honor. Because what we have here is actually on the day of the injury, he goes to St. Anthony's Hospital in June 7, 2007, where he does complain of left arm and left shoulder pain and says he has tingling. This is in addition to the back pain. But your opponent is only pointing out that he didn't complain in 2008 and 2009. He doesn't deny that he complained in 2007. I think that the explanation for that, Your Honor, I think there is an explanation that has been brought up both by Dr. Pervines and also Dr. Wilke. Dr. Wilke stated, their doctor, that it's not unusual for a claimant to be focused on one particular area of an injury when they have two. Dr. Pervines, in fact, testified that, and I can get to this in a second, that it was brought up as far as the ridiculous problems, but he had told my client, we'll deal with that later, and I think this quote was placed on the back burner. My client testified during the trial that his main and primary focus throughout was that of his lower back until such time that the dorsal column stimulator was implanted. But even so, when the dorsal column stimulator was implanted, I believe, in 2009, actually August 21, 2009, in a lot of the records that are pointed to by counsel in his brief about there not being any reference to the neck, occurred before August 21, 2009. But even with that, if you go through the records, again going back to St. Anthony's, there was a complaint made at that time. He sees Dr. Guy Aden, who is his family doctor, complains of left arm pain, and he doesn't order x-rays or anything with regard to the arm. Dr. Aden goes and sends him out for a cervical MRI, which shows the herniation at C7T1. So obviously they suspected a neck problem at that time, and that was right in time of the injury. He also gets sent to Bunker Hill Physical Therapy, June 15, 2007, where it's noted that he's having popping and cracking of the neck that's accompanied by motion of the cervical spine. The left upper extremity and numbness and tingling, and they also find tightness in the cervical as well as the lumbar, as it would be expected with a lumbar spine. So there is history that is evident that there was a cervical and neck injury the date that he was hurt, in addition to the lower lumbar injury. He does see Dr. Purvine's neurosurgeon, who is his treating physician, and Dr. Purvine's main goal at the time that he sees him is that of fixing the lumbar area where he sustained a herniation, L5-S1, and ended up in interbody fusion at that level. But even so, during this period of time where Purvine's readily stated in his deposition that that was his main focus, was fixing the lumbar spine. In fact, I think both Dr. Willke and Dr. Purvine stated, you don't want to work on two areas of the spine at the same time. So obviously the neck was put on the back burner, which was also put in my client's mind, in addition to the pain that he was having with regard to the lumbar area. But despite that, there are records that Dr. Purvine's, one dated October 4, 2007, where he had mentioned weakness in his bilateral upper arms. And then November 26, 2007, I'm sorry, on October 8, 2008, he also mentioned to Dr. Purvine's about cramping and uncontrollable movements in the right arm. And Dr. Purvine's noted at that time that he thought there may be something with regard to the cervical and thoracic spine. But again, at that time, his mode was just looking to fix the lumbar spine and at some time he was going to deal with the cervical and thoracic. So what you seem to be saying is if you have, let's say you have an injury, you have an x-ray and it shows that you have some type of a fracture on your wrist, the fact that you don't complain about it doesn't mean you don't have a work-related injury. That is correct. And I'm just also trying to reiterate that there has been a history, consistent after this accident, you know, leading up. And then where this became an issue, honestly, was after the dorsal column stimulator was put in. My client testified now that the noise and the pain with regard to his lower back had subsided, he focused on his neck. And it was at that time that he goes back and he sees Dr. Fervines and he mentions Dr. Fervines about his neck. And again, they do an examination at that time. They find similar findings as they did before where there's still tightness and also Dr. Fervines looks at the MRI and still reiterates in his deposition that that was a fresh herniation. And he did that based upon the intensity. He said it was brighter. He said chronic conditions are darker. So I don't think he backed off his statement. I believe that the commission believed Fervines, correct? The commission believed Fervines. And even Wilkie stated it was his opinion within a reasonable degree of medical certainty that my client did sustain a cervical injury. So the fact that we're now trying to kind of quarterback after the game's over and look back at Dr. Tom's records and say, hey, Dr. Tom stated that that particular neck injury was not the sole cause, I think, is, you know, it doesn't get there. I think based upon the doctor's testimony of Fervines, their own Section 12 examiner saying that my client sustained some sort of cervical injury, I think that clearly that the three tribunals leading up to today got it right and I don't think that there's anything with regard to my client's injury that substantiates in any way or fashion it was not related to the original injury. Thank you, counsel. Thank you. Counsel, you may reply. The records from Dr. Tom are pretty clear. And, again, I think the opinions of Dr. Fervines are clear, that in order for there to be a relation, that there cannot be any break or cause or severance in this consistent pain from the date of accident. And two years ago... Fervines says that? Yes, Fervines specifically testified to that on cross-examination. They wanted to give a causal connection. I think he was saying that if the petitioner has had this problem consistently from the date of accident forward, then it would be related. So in the petitioner testified that he did. Correct. But you say that there's some contradictory evidence in the record. Well, that's fine. But the commission has got to decide the credibility. And they did. They believed it. And I don't know how you can weigh evidence where a guy says, many years after the accident, that I've had this consistent neck pain, whenever he's impeached by his own admission. Well, we know he had it in 2007 because the record says he has. He had arm pain, no neck pain. Well, no, he complained of the neck in 2007. The records say he complained of the neck in 2007. I did not see any medical records that said he complained of neck pain in 2007. The physical therapy notes say he did. It said with active range of motion he had popping and cracking. He actually told Dr. Brummett in 2007, a pain doctor, that he had no complaints of neck pain. We know he said that too. But in 2007, I'll tell you what it said. Physical therapy evaluation on June the 15th. Cervical, thoracic, and lumbar spine, that's what they were sent there for. He suffered from pain in his low back, his left groin, his buttocks, numbness down his left arm and tingling to his left foot, popping and cracking in his neck. And if you believe there's a neck injury in 2007, that's fine. You still have to get past the point of Dr. Tom having probably over eight physical examinations where he specifically notes the guy doesn't have any cervical pain. I don't know how the commission gets around that. It's one thing if Dr. Tom only had one note that said he didn't have cervical pain. Every single one of Dr. Tom's medical records say that he doesn't have cervical pain, that he doesn't have any arm symptoms, specifically denies cervical problems. It's not like it's one note. And Dr. Tom's saying he's spending 30, 45 minutes with the patient each time, and the guy specifically denies it. That means that the problem wasn't present for well over a year of treatment with Dr. Tom. I don't know how the commission can ignore that. I don't know how that important information in the medical records that the petitioner is telling his doctor that completely and totally contradicts his testimony at the time of trial can be ignored by the commission. I don't know how the commission can ignore that. We don't know. If he keeps saying he ignored it, maybe they just decided to weigh it and decided it wasn't that significant. Did they really ignore it? And again, as a manifest weight evidence, how is that insignificant? How are over ten times of the petitioner saying, I don't have any neck pain. I don't have any arm symptoms in 2008-2009. How is that insignificant? How is that not reaching the medical records? Petitioner said he didn't have any problems in 2008-2009? Look at Dr. Tom's medical records. Almost every single one of them says he specifically denies cervical problems. He denies neck pain. And then Dr. Tom, when he first gets cervical pain, Dr. Tom takes a history of recurrent pain, and then Dr. Tom fails to give causation between the work accident and the... But the claimant testified he had continual pain, didn't he? So he gets impeached by the medical records. Not just some medical records. Extensive medical records. I mean, I think that that's something that cannot be ignored, especially on a manifest weight issue. The medical records completely and totally contradict what he says about the problem. Thank you. Okay. Thank you, Counsel Bolt, for your arguments. This matter will be taken under advisement, and a written disposition shall issue. The court will stand in recess until 9 tomorrow morning.  Subject to call.